Argued December 11, 1969, affirmed June 10, 1970

SETSER, *Appellant, v.* COMMONWEALTH, INC., *Respondent.*

470 P2d 142

*Donald C. Walker*, Portland, argued the cause and filed briefs for appellant.

*Howard M. Feuerstein*, Portland, argued the cause for respondent. With him on the brief were George

H. Fraser, Cleveland C. Cory, and Davies, Biggs, Strayer, Stoel & Boley, Portland, and Herbert H. Anderson and McColloch, Dezendorf, Spears & Lubersky, Portland.

Before PERRY,* Chief Justice, and SLOAN, O'CONNELL, DENECKE and HOLMAN, Justices.

O'CONNELL, J.

Plaintiff brings this action to recover a broker's commission alleged to have been earned as a result of producing a purchaser for the sale of property owned by defendant. The jury returned a verdict in favor of plaintiff. Upon defendant's motion, the trial court entered a judgment for defendant notwithstanding the verdict. Plaintiff appeals.

Martin Manor, Inc., owned Cedar Hills Manor, a 100-unit apartment house. The property was subject to a mortgage for $580,000 held by New York Life Insurance Company. Commonwealth, Inc., the defendant, owned all of the common stock of Martin Manor, Inc.

In the latter part of 1964, plaintiff and his saleswoman, Mrs. Abbott, sought out Mr. Jeffrey Holbrook, then executive vice president of defendant. Plaintiff testified at trial that when plaintiff inquired whether Cedar Hills Manor was for sale, Holbrook stated that it was and that Commonwealth wanted $750,000 for the property.

Plaintiff told Holbrook that he would expect a commission of $28,000. Holbrook declined to give plaintiff a written listing but, according to plaintiff's testimony,

---

* Perry, C.J., resigned June 1, 1970.

Holbrook indicated that if plaintiff "got a purchaser that would pay the price that he [Holbrook] wanted, net, plus our commission, $778,000, that he would make sure that we got our commission." Commonwealth agreed to protect plaintiff by quoting $778,000 as the price to other prospective purchasers.

The sale of Cedar Hills Manor was to be by the sale of the common stock of Martin Manor, Inc. Plaintiff, however, computed the amount of his commission as though the transaction were a sale of real estate, using realty board rates.

After showing the property to three other prospective purchasers, Mrs. Abbott showed the property to Mr. and Mrs. Glenn Allen and soon thereafter Mrs. Abbott drew up a Stock Purchase Agreement, the pertinent parts of which are set out in the margin.[1]

---

[1]        "STOCK PURCHASE AGREEMENT

                                "Portland, Oregon. Jan. 8, 1965
"Received of Glenn L. Allen and Nancy P. Allen, husband and wife, hereinafter called the purchasers, the sum of $25,000 ($5,000. check and approximately $20,000 in securities; 188 shares of Transamerica ($9,000) and 139 shares of New England Fish Co. $5 preferred ($11,000) as earnest money and part payment for the purchase of all of the outstanding stock of Martin Manor Inc. dba as Cedar Hills Manor.
"* * * * *

"The sales price for the total transaction is $778,000, on the following terms: Purchasers to pay the sum of $25,000 hereinabove receipted for, additional payment of $55,000, to be paid on or before six months from the above date, and at that time possession of Cedar Hills Manor is to be given to the purchasers. An escrow agreement shall be entered into by the purchaser and seller which shall provide for a five year term to complete purchase of stock. The stock shall be held by an escrow agent and pledged back to Commonwealth Inc. until payment of all money due has been completed, approximately $113,000. Purchaser shall have the voting right of stock and possession of Cedar Hill Manor. Purchaser agrees to pay 6% interest per annum on the unpaid balance of $113,000, and to pay this monthly.
"There is an existing F.H.A. mortgage of approximately $585,000.

on this property which Martin Manor Inc. dba Cedar Hills Manor owes New York Life Insurance Co. Sale includes F.H.A. reserve account for replacement of approximately $45,000. Purchaser shall have the right to use the same and make replacements as necessary. Purchaser agrees to keep the building maintained according to F.H.A. specifications at all times. Purchaser agrees to keep the existing mortgage current at all times, and shall make this payment monthly to Commonwealth Inc.

"Sellers do hereby warrant to hold purchasers safe and harmless from Federal liens or suits or liabilities which might arise in the future resulting from the period of time Commonwealth Inc. owned this stock.

"Seller and purchaser agree to prorate the property taxes which are due and payable for the current year, rents, interest, insurance premiums, fuel, and other matters as of the time of possession.

"[sgd]   Bill Setser Realtor
Bill Setser Realtor

"[sgd]   Betty Ross Abbott
Betty Ross Abbott

### "AGREEMENT TO PURCHASE

"Jan. 8, 1965

"I hereby agree to purchase the above described stock at the price and on the terms set forth above, and grant said Realtor a period of twenty days hereafter to secure seller's acceptance hereof, during which period my offer shall not be subject to revocation. Contract or escrow agreement is to be prepared in the name of Hazelwood Chronic & Convalescent Hospital, Inc.

"I acknowledge receipt of a copy of the foregoing offer to buy and earnest money receipt bearing my signature and that of the Realtor.

"Purchaser [sgd] Glenn L. Allen

[sgd] Nancy P. Allen

### "AGREEMENT TO SELL

"Date   Jan. 8, 1965

"I hereby approve and accept the sale of the described stock and the price and conditions as set forth, and agree to pay the above named Realtor for services a commission of $28,000.00. I instruct Realtor to place in his special trust account the above described earnest money deposit until needed in the closing of the trans-

The Allens signed the agreement. A few days later plaintiff, Mrs. Abbott and Mr. Allen met with Mr. Holbrook at the Commonwealth office. Mr. Holbrook was then handed the Stock Purchase Agreement, which he read.

On direct examination plaintiff testified that after Holbrook read the Stock Purchase Agreement, Holbrook said " 'This is a deal. This is a sale.' * * * 'There's no problems here.' * * * 'We'll go ahead and close the sale.' " As plaintiff was leaving, Holbrook said to plaintiff, " 'You don't look like a broker who has just earned $28,000.00.' "

On cross-examination, however, plaintiff testified that Holbrook's full statement was: " 'There are no problems here that we can't work out.' "

Plaintiff further testified:

"* * * [A]fter he [Holbrook] had accepted the sale, * * * he says, 'There are no problems here.' He says, 'This is a sale.' He says, 'Now, there may be some details that we can work out later,' but he says, 'There are no problems here. This is a deal.'

"Q. Didn't you say a while ago that he said, 'There are no problems here that we can't solve'?

"A. Right. He said, 'There are no problems here that cannot be handled,' and this was mentioned a little later, and he mentioned this to Allen that there might have to be a servicing fee.' "

action. I acknowledge receipt of a copy of this contract bearing my signature and that of the purchaser named above, and of Realtor.
"* * * * *

"SELLER ........................................................................

........................................................................

........................................................................"

Mrs. Abbott testified that:

"* * * Mr. Holbrook went over the complete agreement, which takes perhaps 10 minutes, and said this was fine, this was a sale, this was a transaction, *that there would be details to work out but there would be nothing to it*; then he looked at Mr. Allen and said he was very happy to have him as a purchaser." (Emphasis added.)

She further testified that Holbrook stated that Commonwealth would close the transaction upon the execution of a contract written by its attorneys rather than upon the basis of the Stock Purchase Agreement.

"Q. All right. Now, what, if anything was mentioned there about Commonwealth's signing [the Stock Purchase Agreement]?

"A. *Mr. Holbrook said that he would not sign it on that day but he had no doubt that it would be worked out. He said, 'Our attorneys will write the contract,' and Mr. Boley was an attorney for Commonwealth, and, he said, 'We'll write up the contract and we'll close on the contract.'*" (Emphasis added.)

Mr. Allen testified as follows:

"* * * [F]irst of all he [Holbrook] mentioned that it was strictly a stock purchase and that as such was a very complicated transaction and at that time he inferred that the offer was not acceptable in its present form but he did concur on the fact that they were willing to continue negotiations and we had something to talk about."

Plaintiff testified that on several occasions he had requested Mr. Holbrook to sign the Stock Purchase Agreement:

"* * * and he [Holbrook] says, 'There's no need of that.' He says, 'We're closing it out. It will be closed in just a few days.'"

Mr. Holbrook testified that he had stated that the Stock Purchase Agreement "obviously was not acceptable and it could provide a basis for consideration but would require a great deal of consideration and some very definitive changes," and that the preparation of a counter-proposal would have to be through Commonwealth's attorneys.

Shortly after the conference, Holbrook wrote a letter to Commonwealth's attorney asking him to draft a formal agreement based upon the Stock Purchase Agreement, but with five specific changes.

The draft contract of sale prepared by Commonwealth differed from the Stock Purchase Agreement in a number of respects. The draft contract provided for cancellation of a $106,000 debt which Martin Manor, Inc. owed Commonwealth and which was not mentioned in the Stock Purchase Agreement. The draft provided for a monthly payment of principal and interest of $2,359, the balance to become due at the end of three years; the Stock Purchase Agreement was silent as to the nature of the installments. The draft called for an override on the existing mortgage. It provided that Commonwealth was to have voting rights in the event of default. In the draft, Commonwealth disclaimed any warranty other than good title to the stock. The draft also moved up the date of possession.

The Allens refused to sign the contract submitted by defendant, principally because they finally decided that the property was overpriced.

The trial court held that the evidence was not sufficient to support a finding that defendant accepted the offer contained in the Stock Purchase Agreement.

We concur in the trial court's conclusion that the evidence was insufficient to establish defendant's acceptance of the buyers' offer.

Holbrook's statements: "This is a deal, this is a sale" and the other comments made by him tending to show that he considered the offer a favorable one were accompanied by other statements indicating that there were problems yet to be resolved before a contract would be created. Holbrook's statements that "there may be some details that we can work out later" and that "there are no problems here that cannot be handled," although expressing Holbrook's optimism that the deal would go through, nevertheless indicated that something more had to be worked out before the contract was complete. This is fortified by the fact that Holbrook refused to sign the Stock Purchase Agreement. He made it clear that the transaction was to close upon the execution of a written contract to be prepared by Commonwealth's attorneys. He said, "We'll write up the contract and we'll close on the contract."

No definite test can be laid down to determine whether an offer is accepted. As Mr. Justice LUSK observed in *Wagner v. Rainier Mfg. Co.*, 230 Or 531, 371 P2d 74 (1962): "The cases are legion and * * * no case has a brother." (230 Or at 542.) The *Wagner* case does, however, offer some enlightenment for us here. In that case the plaintiff, a contract logger, made an offer to the defendant company. It was contended that the following response by the company constituted an acceptance of the offer:

"Dear Sir:
"In regard to logging the timber on Section 18-T3S-R7W and Section 13-T3S-R8W, which we have dis-

cussed with you, we wish to state that we consider your logging bid favorable. We will have our attorney draw up a contract covering points generally outlined in your Plywood Products Timber Company contract.

"We shall need a performance bond, and no doubt a financial statement. However, we can discuss these points later.

"This memo will give you an assurance that we will work out this matter with you subject to such points as our attorney brings up.

"Yours very truly,

"RAINIER MANUFACTURING CO."

(230 Or at 535-36.)

The court held that the letter did not constitute an acceptance. In comment on the company's response, the court said: "The language 'we consider your logging bid favorable' is equivocal and, although possibly susceptible to the interpretation that it was intended to be an acceptance, does not necessarily bear that meaning." (230 Or at 540.)

We think that Holbrook's statements set out above were of the same equivocal character and did not constitute an acceptance of the offer submitted by the Allens.

Although we rest our opinion on the ground that the prospective buyers' offer was not accepted, we wish to take note at this time of another theory upon which the present case could have been decided and although we do not now adopt that theory we think that it is worthy of consideration in a subsequent case.

It has been held that even if the seller accepts the offer of the buyer procured by the broker, that in itself is not sufficient to create a legal obligation upon

the part of seller to pay the broker's commission. The cases so holding reason that there should be no recovery when the transaction is not consummated as a result of the buyer's failure to complete it. It is felt that the owner of property who employs a broker to procure a purchaser bargains not simply for the presentation of a person who is willing to sign a contract, but one who is able and willing to complete the sale transaction.

As Denning, L.J., said in *Dennis Reed, Ltd. v. Goody* [1950] 2 K B 277, 284, 1 All E R 919, 923:

> "* * * The house-owner wants to find a man who will actually buy his house and pay for it. He does not want a man who will only make an offer or sign a contract. He wants a purchaser 'able to purchase and able to complete as well.'"

The leading case in the United States adopting this point of view is *Ellsworth Dobbs, Inc. v. Johnson,* 50 NJ 528, 236 A2d 843, 30 ALR3d 1370 (1967).[2] In that case the prospective purchaser had entered into a contract of purchase with the owner but did not complete the contract because he was financially unable to do so. The court said:

> "* * * In reason and in justice it must be said that the duty to produce a purchaser able in the financial sense to complete the purchase at the time fixed is an incident of the broker's business; so too, with regard to any other material condition of the agreement to purchase which is to be performed at the closing. In a practical world, the true test of a willing buyer is not met when he signs an agree-

---

[2] See Note, 23 Rutgers L Rev 83 (1968) for a careful discussion of the leading case. See also, Note, 9 Ariz L Rev 519 (1968); Note, 17 Cath U L Rev 487 (1968); Note, 72 Dick L Rev 522 (1968); Note, 19 Mercer L Rev 460 (1968); Note, 10 Wm & Mary L Rev 240 (1968).

ment to purchase; it is demonstrated at the time of closing of title, and if he unjustifiably refuses or is unable financially to perform *then*, the broker has not produced a willing buyer." 50 NJ at 548.

The court then laid down the following rule:

"* * * When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, * * * there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. In short, in the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale."⑨

---

⑨ The court went on to say:

"We reject the proposition that whenever the owner-seller enters into a binding sale contract with the proffered customer, the broker's right to commission is complete unless the owner has made a special agreement with the broker that such right is contingent upon the closing of title. The basic law governing the owner-broker relationship is declared to be that absent default by the owner, the contract of sale must be performed by the buyer before liability for commission is imposed upon the owner. Execution of a contract to sell to the tendered purchaser, without more, will not bar the owner from relying upon the financial or other inability or failure of the buyer to complete his undertaking as an absolute defense to the broker's suit. It is our view and we so hold that in entering into the contract of sale the owner is entitled to assume that the customer is, or will be at the time fixed for closing, financially able to meet the terms of sale, and that he

It should be emphasized that the adoption of this rule does not mean that the buyer must completely perform all of the terms of an installment contract of sale before the broker is entitled to his commission. Thus, if the buyer has done everything necessary under the contract to close the sale and there remains only the payment of future installments, the broker need not wait until the future installments are paid before he is entitled to his commission.

In such a case the sale is deemed to have been consummated subject to defeasance only by the subsequent failure to perform. This is to be contrasted with the situation where, although there is a contract of sale, the buyer has not paid any money to the seller nor done any other act called for by the contract. Where the buyer fails to make the down payment or other acts ordinarily regarded as a part of and necessary to the closing of the sale, the transaction is not consummated and the broker is not entitled to a commission.

---

is now and will be at performance time willing to complete the transaction. Further we hold that even if both broker and seller, on execution of the contract of sale, in good faith believe the buyer to be financially able to perform, and it turns out otherwise at the crucial time, the seller cannot be held for commission. What must be regarded as the fundamental intendment of the parties, owner and broker, i.e., that the owner will sell and the buyer will pay, and the broker will thus earn his commission out of the proceeds, cannot be ignored in this connection." 50 NJ at 551-52.

In a later portion of the opinion, the court raised an additional question: "To what extent may the broker, by special contract, thwart the general rules now declared to control the usual relationship between him and an owner who engages him to find a purchaser?" 50 NJ at 552, 236 A2d at 856. That question is not presented in the case at bar and we decline at this time to answer it. Cf., Wallace, The Real Estate Broker's Undertaking, 13 Vand L Rev 675 (1960); Meyer, The Broker's Exclusive Listing Contract—Unilateral or Bilateral?, 61 W Va L Rev 274 (1959).

Likewise the transaction would not be consummated where the buyer and seller have signed only an earnest money agreement (even though that agreement constitutes a contract of sale) and the buyer has not performed the acts called for by the agreement.

It should also be re-emphasized that this rule is not applicable when the sale is aborted as a result of the seller's repudiation of the contract.[4]

As we have already indicated, we call attention to this rule only because we feel its adoption should be the subject of argument in the appropriate case in the future.

The judgment is affirmed.

---

[4] Note, 7 Kan L Rev 536 (1959).