Argued June 6, affirmed September 8, 1972

WRIGHT, *Appellant, v.* SCHUTT CONSTRUCTION
CO., INC., *Respondent.*

500 P2d 1045

*Ralph D. Barrett,* Springfield, argued the cause for appellant. With him on the briefs were Harms and Harold, Springfield.

*Max S. Taggart, II,* Springfield, argued the cause for respondent. With him on the brief were Sanders, Lively & Wiswall, Springfield.

An amicus curiae brief was submitted by Norman F. Webb, Salem, on behalf of Oregon Association of Realtors.

TONGUE, J.

This is an action by a real estate broker to enforce a provision in an exclusive listing agreement to the effect that in the event the owner of the listed property withdrew the authority of the broker to sell the property the owner agreed "to pay you the said commission just the same as if a sale had actually been consummated by you."

The listing agreement authorized plaintiff to sell defendant's property for the price of $200,000, "net to owner." Defendant terminated the agreement prior to its expiration date. Plaintiff's complaint demanded payment of $20,000 as a commission.

The trial court held that the provision for payment of a full commission on withdrawal of authority to sell was a penalty and refused to enforce it, based upon finding that plaintiff did not prove that he would have been able to sell the property for $200,000 "net to owner" so as to earn his commission, but for defendant's breach of the agreement, and that "to use a prospective commission as a measure of damages would indulge in pure speculation." Because of the breach of the agreement, however, and because plaintiff offered no proof of actual damages, the trial court awarded nominal damages of $1, plus $4,330 in attorney fees.

Plaintiff appeals, contending that the trial court erred in holding the "stipulated sum" to be a penalty, and also erred in denying recovery for a "debt due and owing." We affirm because we agree with the finding and conclusion of the trial court that the provision of the listing agreement for payment of a full commission on wrongful termination of the agreement was a penalty under the facts and circumstances of this case, although not for the precise reasons given by the trial court.

■ While the courts cannot create new contract obligations, the courts can, in the interest of public policy, excuse the performance of contractual obligations which are contrary to the public interests. 5 Williston, Contracts (3d ed) 639, § 769. See also 5 Corbin, Con-

tracts 320, 334, §§ 1055, 1057. Thus, as stated in 1 Restatement 552, Contracts § 339, comment *a*:

"Punishment of a promisor for breach, without regard to the extent of the harm that he has caused, is an unjust and unnecessary remedy. Therefore, the power of parties to make an enforceable contract for the determination of damages in advance is limited as stated in this Section."

One reason for this result, as stated in 5 Williston, *supra*, 703, § 780, is that:

"* * * experience has shown that dangerous advantage is likely to be taken of a party to a contract if he is allowed to stipulate in advance as a part of the contract that he will pay damages of any amount which the agreement may name, if he breaches the contract."

On the other hand, much of the hostility formerly expressed by courts to provisions for liquidated damages has moderated in recent years as the courts have come to recognize that contract provisions for liquidated damages, under proper limitations, can save the time of the courts, as well as the parties, and also reduce the expense of litigation. Cf. *Secord v. Portland Shopping News et al,* 126 Or 218, 225, 269 P 228 (1928); and *Medak v. Hekimian,* 241 Or 38, 45, 404 P2d 203 (1965).

Perhaps the most widely accepted modern statement of the requirements which must be satisfied for a valid and enforceable contract provision for liquidated damages is set forth in 1 Restatement, *supra*, 552, § 339(1), as follows:

"An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

"(a) the amount so fixed is a reasonable fore-
cast of just compensation for the harm
that is caused by the breach, and

"(b) the harm that is caused by the breach is
one that is incapable or very difficult of
accurate estimation."

In *Medak v. Hekimian, supra* at 44, this court
cited § 339 with approval, although stating these two
requirements in somewhat different terms. See also
*Harty v. Bye,* 258 Or 398 at 407, 483 P2d 458 (1971).

In applying the first of these requirements the
primary consideration is one of "just compensation."[*]
See 1 Restatement, *supra,* § 339, comments *a* and *b*.
See also 5 Williston, *supra,* 689, § 778. In deciding
whether "the amount so fixed is a reasonable forecast
of just compensation for the harm that is caused by
the breach," there is considerable conflict among the
authorities as to whether, and, if so, how, the intention
of the parties can have any importance. According to
1 Restatement, *supra,* 553, § 339, comment *b,* "neither
the intention of the parties nor their expression of
intention is the governing consideration." Indeed, most
modern authorities appear to agree that whether the
parties *intend* a contract provision to be one for liqui-
dated damages, rather than a penalty, is not control-
ling. See 5 Williston, *supra,* 682, § 777, and 5 Corbin,
*supra,* 340, § 1058, and cases cited therein. But see
*Krausse v. Greenfield,* 61 Or 502, 512, 123 P 392 (1912);
*Strode v. Smith,* 66 Or 163, 175, 131 P 1032 (1913);

[*] Although defendant also denies that the second of these
requirements (Subsection (b)) was satisfied in this case, we
prefer to rest our decision upon a discussion of the first of these
requirements (Subsection (a)).

*Alvord v. Banfield,* 85 Or 49, 57, 166 P 549 (1917). Cf. *Medak v. Hekimian, supra* at 44.

It may be, however, as stated in 5 Williston, *supra,* 693, § 778, that:

> "The only sense in which the intention of the parties can have any meaning * * * is * * * to name a sum that is fixed in good faith as the equivalent of the injury which will probably be caused by the breach of the contract, rather than an attempt to secure performance by a provision for an excessive payment."

This is consistent with the statement in 5 Corbin, *supra,* 345-346, § 1059, that there must be a "genuine pre-estimate of injury" as of the time when the contract was made, and that it is sufficient if at that time parties in an equal bargaining position make an honest and good faith effort to arrive at such an estimate. This is also consistent with the requirement of 1 Restatement, *supra,* 552, § 339(1)(a) that there must be a "reasonable forecast of just compensation for the harm that is caused by the breach." See also McCormick, Damages 607, § 149 (1935).

■ The authorities also are not in complete accord on the question of the effect of evidence that despite such a good faith "pre-estimate" or "forecast" of such damages, the parties were mistaken in that no actual damages resulted from the breach, or the amount of the actual damages was much less than the amount of the liquidated damages. There is general agreement, however, with the proposition that a contract provision for liquidated damages will not be declared to be a penalty because the stipulated amount to be paid as damages is more than the amount of the actual damages unless the stipulated amount is "grossly dis-

proportionate," or has no "reasonable relation" to the probable loss, as anticipated at the time of the contract. McCormick, *supra,* 606, 623, §§ 149, 157; 5 Williston, *supra,* 703, § 780; 5 Corbin, *supra,* 362, § 1063. See also *Hull v. Angus,* 60 Or 95, 107, 118 P 284 (1911); *Learned v. Holbrook,* 87 Or 576, 585, 170 P 530, 171 P 222 (1918); *Secord v. Portland Shopping News et al, supra* at 223-24; *Elec. Prod. Corp. v. Ziegler Stores,* 141 Or 117, 125, 10 P2d 910, 15 P2d 1078 (1932); *Dairy Coop. Ass'n. v. Brandes Cry.,* 147 Or 488, 500-501, 30 P2d 338 (1934); and *Medak v. Hekimian, supra* at 45-46. In such an event the courts will refuse to enforce the contract provision because "the amount so fixed was not a reasonable forecast of just compensation," and will thus leave the plaintiff to proof of his actual damages, to paraphrase 1 Restatement, *supra,* 552, § 339(1)(a). See also 5 Williston, *supra,* 668, § 776.

■ However, as stated in 5 Corbin, *supra,* 347, § 1059, although the reasonableness of the "forecast" or "pre-estimate" is to be determined as of the date of the contract, "[h]indsight sometimes demonstrates the error in foresight." Another reason given for this same result is that the excessive size of the sum agreed upon, in relation to the actual damages, may tend to show that the parties did not make the required bona fide effort to arrive at a reasonable forecast or pre-estimate of the expected possible damages. 5 Williston, *supra,* 725-26, § 783. For these reasons, it is held in some jurisdictions, including Oregon, that the defendant may offer evidence that plaintiff suffered no actual damages or that the amount of the liquidated damages would be "grossly disproportionate" or without "reasonable relation" to the amount of the actual damages. See 5 Corbin, *supra,* 364-367, § 1063. See also 1 Re-

statement, *supra,* 553, § 339, comment *c,* and Sweet, Liquidated Damages in California, 60 Calif L Rev 84, 138 (1972).

Thus, in *Harty v. Bye, supra* at 407, we refused to enforce a contract provision for liquidated damages for delay in the drilling of a well beyond a date specified in the contract because of evidence that no actual damages were suffered as a result of that breach of the contract. See also *Hull v. Angus, supra* at 104-107.[2] In such an event, however, the defendant ordinarily has the burden of proof to establish that contention. McCormick, *supra,* 623, § 157. See also *Learned v. Holbrook, supra* at 588. But see *Alvord v. Banfield, supra* at 58.[3]

This court has not previously had occasion to consider these questions as they may apply to real estate listing agreements. In *Setser v. Commonwealth, Inc.,* 256 Or 11, 470 P2d 142 (1970), an action to recover a commission under a listing agreement, no question of liquidated damages was involved. The

[2] In actions on contractor's bonds, however, the absence of actual damages is not a defense. See Salem v. Anson, 40 Or 339, 345-346, 67 P 190 (1902); and Grants Pass v. Rogue River P. S. Corp., 87 Or 637, 643, 171 P 400 (1918). See also 5 Corbin, Contracts 359, § 1062.

[3] Another factor of importance in the determination of whether the amount fixed in the contract is to be regarded as a reasonable forecast or pre-estimate of the damages resulting from a breach of the contract is whether the same amount is payable regardless of the date of the breach when that date may be of importance in determining the amount of such actual damages. Thus, as held in Secord v. Portland Shopping News et al, 126 Or 218, 224, 269 P 228 (1928), quoting from Alvord v. Banfield, 85 Or 49, 166 P 549 (1917):

" '* * * If there is an agreement for a fixed, unvarying sum, without regard to the date of the breach, when in the very nature of things the date of the breach would be all-important in determining the element of actual damages, the stipulation must be held to be one for a penalty.' "

question was presented, however, of what must be done by a real estate broker to entitle him to payment of a commission in a case in which there was no evidence that the broker had produced a purchaser who was either willing or able to pay the selling price as stated in the listing agreement. In affirming a judgment for defendant we approved by dictum the following rule (at p 21):

" '* * * When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, * * * there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. In short, in the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale.' "

More recently, in *Brown v. Grimm*, 258 Or 55, 481 P2d 63 (1971), we approved this same rule.

In *Brady v. E. Portland Sheet Metal Wks.*, 222 Or 584, 352 P2d 144 (1960), a real estate broker brought an action under an exclusive listing agreement against the owner of the property, who had breached that agreement by entering into a long-term lease for most of the property described in the listing agreement. The listing agreement apparently did not in-

clude a provision for payment of the full commission
on wrongful termination by the owner, as in this case,
but provided for payment of "the usual real estate
commission as set by the Portland Realty Board" in
the event of a sale. This court held that plaintiff was
entitled to payment of such commission without prov-
ing the production of a buyer ready, willing and able
to purchase the property at the listed price, but held
(at p 591) that "it was essential for her to show * * *
that she probably would have sold the property." See
also p 596 and 2 Restatement 361, Agency § 449, com-
ment *a*, and 372, § 455, comment *c*.

We now turn to the problem of the application
of these various rules of law to the facts of this case.

As pointed out by plaintiff, *Brady* is distinguish-
able from this case as in *Brady* no liquidated damage
provision was involved. Thus, plaintiff contends that
the trial court in this case "by requiring the plaintiff
to prove he *would* have earned his commission, instead
of the *probability* that he would have earned his com-
mission, injected the same basic, but higher, standard
of proof for actual damages into a liquidated damages
issue."

If it is a requirement for the validity of a pro-
vision for liquidated damages that the parties, at the
time of the contract, must have made an actual and
"genuine pre-estimate of the injury" or to "name a
sum that is fixed as the equivalent of the injury which
will probably be caused by the breach of the contract,"
such a requirement was not satisfied by the evidence
in this case. Indeed, evidence offered by plaintiff sup-
ports a strong inference to the contrary.[4]

---

[4] Plaintiff points to the provision inserted in the listing

■ We need not decide that question in this case, however, because it is our opinion that under the facts and circumstances of this case, and regardless of any such intent or affirmative action by the parties, the trial court did not err in finding, in effect, that the payment of a commission of 10% of a purchase price so high as to result in $200,000 net to the defendant (i.e., 10% of not less than $222,222, or $22,222) was not a "reasonable forecast of just compensation for the harm that is caused by the breach," as required by 1 Restatement, *supra,* 552, § 339(1)(a). Because such evidence was offered by plaintiff we need not decide in this case whether, in the usual case, the plaintiff may have the burden to offer evidence to sustain such a payment as one of liquidated damages, rather than as a penalty, or whether the defendant may have the contrary burden.

According to plaintiff's testimony, this same tract of land had been purchased by defendant through plaintiff as a broker in 1966 for $100,000. Plaintiff testified that the value of the property should have doubled in from five to eight years. In April 1970, some four years later, defendant's president, Mr. Treadwell, came to plaintiff and the property was listed for sale at a price that would "net $200,000," thus requiring a gross selling price of at least $222,222, after deducting the agreed 10% commission of $22,222.

agreement by defendant's representative, Mr. Treadwell, reserving for a period of 90 days the right to cancel the listing agreement. This may be sufficient to support the inference that this listing agreement was not a form contract of adhesion (as may be true of form real estate listing agreements under some circumstances), but was negotiated between businessmen of equal bargaining position. It does not, however, support the inference that the parties to this listing agreement made any actual or "genuine pre-estimate of the injury."

Due to the subsequent death of Mr. Treadwell, the only testimony relating to that transaction was that of the plaintiff. Plaintiff admitted, however, that in his opinion this price was a "little high," and that "it was a pretty tough money period during 1970."

At the time of defendant's wrongful termination of the listing over three months later in August 1970, and despite what are conceded to have been reasonable efforts by plaintiff to sell the property, he had been able to find only two possible prospective purchasers. One, despite a "recommendation" by one of its employees that it offer $115,050 for the greater portion of the property, made a firm offer of only $60,000. The other was a proposed "exchange agreement" for other property and would have "created paper" in the amount of $50,000.⁹

Plaintiff testified that he felt that "we could have completed something satisfactory to Mr. Treadwell." In order to be legally entitled to payment of a commission under the terms of the listing agreement upon the production of a prospective purchaser, however, plaintiff was required to produce a purchaser who was "ready and willing to enter a deal for * * * [$200,000 net to owner] or such * * * price as * * * [defendant might] accept."

After examining the record, we agree with the trial judge that at the time of this listing agreement the chances of plaintiff being able to produce a purchaser ready, willing and able to purchase the property for a price high enough to "net" $200,000, or any substantially equivalent amount, were wholly speculative

⁹ There was also testimony that this proposal, which was somewhat complicated, would have resulted in a $50,000 "carry back."

and that they were so remote as to be nonexistent, as a practical matter. It follows that, in all probability, plaintiff would have suffered no damages in any amount from the wrongful termination of the listing agreement unless defendant had agreed to a sale at a lesser price.

It is possible that defendant might have agreed to sell the property at a price substantially lower than such a price, in which event plaintiff would have been entitled to payment of a 10% commission based on that selling price. Indeed, there is evidence that when Mr. Treadwell terminated the listing agreement he was considering an offer to purchase the property for $175,000. That transaction was never completed, however, and the property was never sold, according to the record.

Indeed, plaintiff states in his brief that "with the defendant seeking $200,000, any other terms which would be accepted would be in the $200,000 range."

In any event, because defendant was not required by the terms of the contract to sell for any price less than $200,000 "net," plaintiff was not entitled by the terms of the same contract to demand payment of a full commission of $22,222 (or $20,000, as demanded in this case) as liquidated damages for wrongful termination of the contract when, as in this case, it affirmatively appears that in all probability, he would have been unable to sell the property for $200,000 "net."

We do not hold that a real estate broker who seeks to enforce the provisions of a listing agreement for payment of a full commission based on the listed price upon wrongful termination by the owner of the listing agreement, must necessarily prove the probability that he could have sold the property at the full

listed price. In this case, however, there was not only no such evidence, but it affirmatively appeared, among other things, that in all probability the realtor would not have produced a buyer ready, willing and able to purchase the property at that price. Therefore, we agree with the finding and conclusion of the trial court that to enforce the contract provision requiring payment of a commission based on the full listed price upon wrongful termination by the owner of the listing agreement under the facts of this case would be to enforce the payment of a penalty and that, under these facts, the payment of such an amount as liquidated damages would require the payment of a sum which was not a "reasonable forecast of just compensation" for such a breach.[⑥]

This does not mean that in such a case the realtor is left without a remedy, because he is free to prove any actual damages suffered by him. In this case, however, plaintiff declined to offer such evidence.

---

[⑥] Plaintiff also contends that the trial court erred "in denying recovery for a debt due and owing," upon the ground that "this action was plead and tried as an action on a debt" and citing Baumgartner v. Meek, 126 Cal App 2d 505, 272 P2d 552 (1954), among other cases, in which recovery of a realtor's commission was affirmed without regard to the question whether it was a valid provision for liquidated damages or an invalid provision for a penalty. As stated in 5 Corbin, *supra*, 337, § 1058, the terms used in the drafting of a contract may be of little significance in determining whether a contract provision is one for liquidated damages or for a penalty. In this case, we agree with the finding of the trial court that, in actual effect, this contract provision imposed a penalty. We therefore decline to follow such cases as Baumgartner v. Meek, *supra*.

For similar reasons we reject defendant's contention, citing Pretzel v. Anderson, 162 Ill A 538 (1911), and Kamenjarin v. Williams, 327 Ill 261, 158 NE 568 (1927), that the measure of damages in such a case should be limited to the reasonable value of plaintiff's services because such a provision for liquidated damages may be proper and enforceable under other facts.

For these reasons, and although we do not necessarily agree with all of the reasons given by the trial judge as the basis for his decision, we affirm his decision that under the facts of this case this contract provision was a penalty and, as such, is not enforceable by the Oregon courts. We therefore affirm the judgment as entered by the trial court awarding plaintiff nominal damages in the sum of $1, plus attorney fees.[7]

---

[7] Defendant has cross-appealed from the allowance of attorney fees, contending that because plaintiff was awarded only $1 as nominal damages he was not entitled to an award of attorney fees in the sum of $4,330.

Since, however, defendant failed to make any objection in the trial court to the allowance of such attorney fees, either at the time of trial or by subsequent objection or motion, we decline to consider that question on this appeal.