Argued and submitted April 20, affirmed August 24, 1981

## WALLSTREET PROPERTIES, INC.,
*Appellant,*
*v.*
## GASSNER et ux,
*Respondents,*
*v.*
## KRALJEV,
*Third-Party Defendant.*

## (No. A7807-11824, CA 17381)

632 P2d 1310

Theodore H. Heap, Portland, argued the cause and filed the briefs for appellants.

Thomas K. Hooper, Portland, argued the cause for respondents. With him on the brief were William P. Hutchison, Jr. and Hutchinson & Hutchison, Portland.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

YOUNG, J.

## YOUNG, J.

Plaintiff Wallstreet Properties, Inc., brought this action to recover real estate commissions it claims to have earned pursuant to an agreement for a three-way, tax deferred exchange of real property. The trial court held the exchange agreement unenforceable and denied relief. We affirm.

Defendants Arlo and Hazel Gassner were owners of a 15-unit apartment complex known as the "Coventry Court Apartments." In the fall of 1977, defendants decided to invest in a larger complex and listed Coventry Court for sale with two real estate brokers, R. Parr and Company and Stan Wiley, Inc. The listings were obtained by the brokers' respective agents, Cameron Sinclair and Mike Healy.

A purchaser was subsequently found. On December 5, 1977, defendants executed an earnest money agreement to sell the Coventry Court to Harold and Judy Miller for a price of $235,000. The Millers knew they were not to receive defendants' property directly from defendants; instead, the parties contemplated that defendants would exchange their property for that of a third party, who would in turn convey Coventry Court to Millers. The earnest money agreement specifically provided that it was "subject to seller [Gassners] effecting a tax-deferred exchange agreement."

Third-party defendant Sylvia Kraljev was, at all relevant times, the equitable owner of the "Clipper Ridge Apartments," a 52-unit complex. On January 3, 1978, she put the apartments on the market for sale after entering into a listing agreement with plaintiff Wallstreet Properties, a real estate brokerage firm owned by Mrs. Kraljev's son Gregg and her former husband. Plaintiff, through Gregg Kraljev, advertised the apartments for sale and within a short time received a response from Cameron Sinclair, one of the realtors for defendants. Sinclair asked for and received financial information relating to the apartments and also made a physical inspection of Clipper Ridge. On January 19, 1978, Sinclair approached defendants about purchasing the Kraljev apartment complex as an investment for the tax deferred exchange. Arlo Gassner was apparently interested enough to draft a proposal to

purchase. The proposal stated a purchase price of $970,000 (which was $30,000 less than the listed price). The down payment was to consist of defendants' $145,000 equity in Coventry Court with the balance of $825,000 to be paid on contract.

Sinclair contacted plaintiff, arranged a meeting with Gregg Kraljev and presented the proposal to him. Kraljev, however, did not approve of the form of the proposal and requested that it be redrafted in the form of an earnest money receipt. Sinclair agreed, and the two men worked together to draft an "exchange agreement," using a standard form contract. Defendants signed the agreement on January 28, 1978, and Sylvia Kraljev signed it the next day.

The terms of the exchange agreement stated a total consideration for Clipper Ridge approximating the $1,000,000 price asked by Mrs. Kraljev. Among other things, the agreement imposed upon each party a duty to purchase a policy of title insurance for each of their respective properties "showing titles to be merchantable and free of all liens and encumbrances * * *." Finally, the agreement contained detailed provisions for payment of the brokers' commissions.

Following execution of the exchange agreement by Mrs. Kraljev and the defendants, an escrow was established to close the transaction. The escrow company proceeded to perform various duties, including ordering title insurance. Preliminary title reports were received and transmitted to Gregg Kraljev and Cameron Sinclair.

In mid-March, Sylvia Kraljev submitted a draft of a land sale contract to the escrow company, which forwarded a copy to Sinclair. Sinclair advised defendants to have the proposed contract reviewed by an attorney and referred them to Richard Canaday. Canaday was retained and was given a copy of the proposed contract, the preliminary title report and documentation of underlying encumbrances against the Kraljev property. Canaday reviewed the documents, noted numerous problems and arranged to meet with Arlo Gassner and Sinclair. A conference was held on March 21, at which Canaday explained his concerns and made recommendations.

One problem in particular related to obtaining written consent to transfer from holders of outstanding interests in the Kraljev property. Sylvia Kraljev was purchasing Clipper Ridge from Pollock and Grayson by land sale contract. The contract contained a provision stating:

> "Purchaser agrees not to sell, transfer, or assign this contract or any interest hereunder * * * without prior written consent of seller first being had and obtained."

Additionally, an outstanding mortgage previously given by Pollock to Sherwood & Roberts, Inc., stated:

> "* * * In the event of the sale of the above described premises * * * without first obtaining the written consent of the mortgagee, the balance of the unpaid principal with accrued interest, and all other indebtedness hereby secured, shall, at the mortgagee's election, become immediately due without notice."

Canaday felt that the only way defendants could safely proceed with a contract purchase and avoid a potential lawsuit was to first obtain the consent of Pollock and Grayson and Sherwood & Roberts. He advised Arlo Gassner to do so prior to closing.

It appears that shortly after the March 21 meeting, Sinclair contacted the escrow officer, Jeanne Harris, about obtaining consent from Pollock and Grayson and Sherwood & Roberts. Harris contacted Mr. Grayson's office. Consent was given, but Harris was told by Grayson that under no circumstances was she to take it upon herself to contact Sherwood & Roberts. She was told that further inquiry should be made to Mr. Pollock's office. Harris relayed that information to Sinclair.

Canaday also telephoned Harris; they discussed numerous points concerning the entire transaction. Canaday informed Harris that he would completely rewrite the land sale contract to incorporate terms which he had discussed with Arlo Gassner at the March meeting. Canaday asked Harris to determine whether the items would be generally acceptable to Mrs. Kraljev. During the conversation the subject of Sherwood & Roberts' consent came up; Harris told Canaday that she was instructed not to contact Sherwood & Roberts.

On March 24, Canaday forwarded a draft of the contract as he had rewritten it to Sinclair. A cover letter was also sent in which Canaday continued to advise that Sherwood & Roberts' consent be obtained. Sinclair discussed the contract with Arlo Gassner and informed him of Canaday's advice. Sinclair also hand-delivered a copy of the draft, without the cover letter to Harris and instructed her to send a copy to Mrs. Kraljev, which she did. Sylvia Kraljev reviewed the contract with her son and ex-husband and orally approved it.

At trial, Sinclair testified that, based on his conversations with Mr. Gassner during their review of the Canaday redraft, he believed that Gassner was ready to close the transaction, without consent from Sherwood & Roberts. Sinclair could not definitely state whether Gassner was in fact ready to close; Sinclair had made no contact with Mrs. Gassner. Mr. Gassner testified that he was concerned about not having Sherwood & Roberts' consent and that he was willing to close if that problem could be worked out. On cross-examination he acknowledged that he had indicated to Sinclair that he did not see any insurmountable problems with the contract and would close without Sherwood & Roberts' written consent. Gassner's testimony was an affirmative response to a question couched in those terms, and it is not clear how or to what extent that indication was given. In any event, Sinclair believed that defendants were prepared to close and scheduled a closing appointment with Harris for March 28, 1978.

On March 28, Sylvia Kraljev went to the escrow office and signed the documents necessary to consummate the exchange, including Canaday's draft land sale contract. Defendants failed to keep the appointment.

The only explanation given was that Mrs. Gassner would not sign and would not talk to anyone. The proposed exchange fell through. Mrs. Kraljev sold Clipper Ridge one month later to another party. The Gassners did not negotiate another exchange and did not sell Coventry Court to the Millers.

Plaintiff's claim for its real estate commission was consolidated at trial with a suit by Millers for specific

performance.[1] The trial court concluded that the dispositive issue governing both actions was the enforceability of the exchange agreement executed in January, 1978. The court viewed the document as "an agreement to make an agreement," stated there was no meeting of the minds on various issues and held the contract unenforceable. Relief was denied in both cases.

On appeal, plaintiff first argues that its commission is recoverable whether or not the exchange agreement is capable of being specifically enforced. Plaintiff relies on the language of the exchange agreement itself.

The agreement consists of two major sections, an offer followed by an acceptance. Both sections provide for commissions payable jointly to plaintiff and to Sinclair's firm, R. Parr & Company. The offer by the first party (defendants) provides that "should second party (Kraljev) accept this offer, first party agrees to pay said broker(s) commission for services rendered as follows: $14,100." The acceptance portion further provides: "Second party hereby accepts the foregoing offer upon the terms and conditions stated and agrees to pay commissions for services rendered * * * as follows: $45,000." One term of the agreement states that

"* * * should either party hereto fail to perform and carry out his part of this agreement, such party so failing shall pay all of the broker's commissions which the first and second parties have agreed or may hereafter agree to pay by reason of this transaction, this promise being made directly for said broker's benefit. * * *"

Finally, the contract provides that, should either party be unable to convey marketable title to his property, the other party "shall be released from payment of any commission, unless he elects to accept the property * * *."

In *Setser v. Commonwealth, Inc.,* 256 Or 11, 470 P2d 142 (1970), the Supreme Court set forth the following requirements for recovery of a real estate commission:

"* * * When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his

---

[1] The suit for specific performance is *Miller v. Gassner,* 53 Or App 647, 632 P2d 1318 (1981).

commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, * * * there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. In short, in the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale.' " 256 Or at 21, quoting *Ellsworth Dobbs, Inc. v. Johnson,* 50 NJ 528, 236 A2d 843, 30 ALR3d 1370(1967); *see also, Brown v. Grimm,* 258 Or 55, 481 P2d 63 (1971).

Plaintiff focuses on the language in the contract providing a commission "for services rendered" and argues that its commission was earned for its efforts leading up to the execution of the agreement upon Sylvia Kraljev's acceptance of defendants' offer. Plaintiff contends that *Setser* is inapplicable and that defendants became liable for the entire commission on January 29, 1978, subject to relief from liability in the event that Kraljev failed to deliver marketable title.

A nearly identical issue was addressed in *Woodworth v. Vranizan,* 273 Or 111, 539 P2d 1055 (1975). In that case, defendant seller entered into an earnest money agreement with a buyer obtained by a broker. The sale was not completed, and the broker brought an action to recover the stated commission. Defendant contended the broker was not entitled to the commission because he had not produced a financially able buyer. The broker argued that, under the terms of the earnest money agreement, defendant had agreed to pay the commission "for services rendered" and that he had performed his services by procuring a signed earnest money agreement. The Supreme Court, however, rejected the broker's claim that the earnest money agreement provided a commission for services previously rendered. Relying on *Setser,* the court held:

"When a seller signs an earnest money agreement and agrees to pay a commission, he intends that the commission should be payable only when the purchaser who signed the agreement consummates the transaction." 273 Or at 117.

Although the rule of *Setser* refers to a broker's claim against his principal, the seller, we do not find that distinction to be a sufficient reason for abandoning the rule in this case. The exchange agreement executed by the parties here is much like the earnest money agreement considered in *Woodworth.* The only major difference is that each party to the transaction here was, in a sense, both a seller and a purchaser. In both situations the parties contemplated that, absent some wrongful act or interference, the real estate commission would be paid on completion of the sale. "The *Setser* rule applies to all such agreements." *Woodworth v. Vranizan, supra,* 273 Or at 117.

Moreover, the only provision in the exchange agreement which requires *defendants* to pay a commission "for services rendered" is the clause pertaining to payment of a commission in the amount of $14,100. From the inception of this lawsuit, plaintiff has maintained that defendants are liable for the entire stated commission of $59,100.[2] The only provision in the contract which could subject defendants to that liability is the one referring to a failure of either party "to perform and carry out his part of [the] agreement * * *." Under that provision, the central issue is which party failed to perform. *Wells v. Davis,* 258 Or 93, 96, 480 P2d 699 (1971).

Under the above authorities, plaintiff's claim for its commission is dependent on (1) the existence of a binding contract of sale between Kraljev and defendants and (2) an unjustifiable failure by defendants to carry out their part of the agreement and close the transaction.

Defendants contend the exchange agreement is unenforceable. To support their argument, they recite 15 terms which the agreement does not cover. Plaintiff claims

---

[2] Plaintiff seeks to recover the entire commission on behalf of all three brokers involved in the transaction. The commission was to be divided as follows: $14,100 to Stan Wiley, Inc.; $22,500 to R. Parr and Company, Sinclair's employer; and $22,500 to plaintiff.

that these items are non-essential or have been supplied by the parties' conduct and that the agreement is enforceable because all material terms are present. Plaintiff relies on a line of cases beginning with *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974), which allowed specific performance of earnest money agreements calling for contract sales, even though some terms had yet to be decided. *See also, Southworth v. Oliver,* 284 Or 361, 587 P2d 994 (1978); *Seal v. Polehn,* 284 Or 259, 586 P2d 345 (1978); *Van v. Fox,* 278 Or 439, 564 P2d 695 (1977); *Pittman v. Thomas,* 45 Or App 627, 608 P2d 1223 (1980); *Spinner v. Stacey,* 45 Or App 483, 608 P2d 609 (1980). These cases stand generally for the proposition that an agreement is sufficiently definite and certain to be capable of specific performance if the essential terms are provided.

Assuming, as plaintiff claims, that the exchange agreement is sufficiently definite and certain as to be *capable* of specific performance, that does not necessarily entitle plaintiff to a commission. The above cases were all actions for specific performance brought by purchasers. To recover its commission, plaintiff here seeks to enforce a contract similar to an earnest money agreement against the purchasing party. That introduces an additional element, namely, the quality of the seller's title.

No one here disputes that Sylvia Kraljev did not actually have legal title to Clipper Ridge. She was a contract vendee. Her contract contained a clause requiring the consent of the vendors to any sale of the property, and an underlying mortgage required similar consent from the mortgagee, Sherwood & Roberts. Kraljev's vendors gave consent, but none was obtained from Sherwood & Roberts. The ultimate question for decision here is whether defendants were justified in failing to consummate the exchange with Kraljev without Sherwood & Roberts' consent having first been given.

The printed portion of the exchange agreement provided, in pertinent part:

"The parties hereto shall * * * deliver, within 60 days or sooner from [the] date this offer is accepted, all instruments in writing necessary to * * * consummate this exchange. Each party shall supply Preliminary Title Reports for their respective properties. Evidences of title

> shall be Title Association standard coverage form policies of title insurance showing titles to be merchantable and free of all liens and encumbrances, except taxes and those liens and encumbrances as are otherwise set forth herein."

In the next paragraph the agreement stated:

> "If either party is unable to convey marketable title * * * within three months after acceptance hereof by second party, * * * then this agreement shall be of no further effect * * *."

The latter provision implies that the transaction was to close within three months from the date of acceptance. The former provision, requiring the parties to deliver all necessary documents within 60 days, indicates that the parties intended that each should deliver a policy of title insurance "showing titles to be merchantable and free of all liens and encumbrances, except those liens and encumbrances as are otherwise set forth herein" as a condition precedent to closing. *See Sheehan v. McKinstry, et al,* 105 Or 473, 210 P 167 (1922). No exceptions are set forth in the contract. The failure of one party to satisfy a condition precedent will excuse the other party's non-performance, *Brady et ux v. Ray et al,* 223 Or 613, 353 P2d 554, 355 P2d 258 (1960), and will prevent specific performance of the contract. *Dan Bunn, Inc. v. Brown,* 285 Or 131, 590 P2d 209 (1979).

Sylvia Kraljev did deliver a preliminary title report as required. The report, however, listed eight encumbrances other than taxes and city liens, including the Sherwood & Roberts mortgage. The condition precedent was not fulfilled, and unless we can say as a matter of law[3] that it was irrevocably waived, the failure of it to occur would prevent specific performance of the exchange agreement.

■■ A party may waive the occurrence of a condition included in the contract for his sole benefit. *Dan Bunn, Inc. v. Brown, supra; Prestige house, Inc. v. Merrill,* 51 Or App

---

[3] The trial judge rendered an oral opinion from the bench at the end of trial, expressing reasons for his decision. Special findings were not requested by either party, and none were made. Judgment was entered on a general finding in favor of defendants. On appeal, that finding has the same legal effect as a jury verdict and must be affirmed if there is any evidence to support it. Former ORS 17.435; ORCP 62.F; Or const, Art VII, sec. 3; *see, generally, Copeland Sand v. Ins. Co. of N. Amer.,* 288 Or 325, 607 P2d 718 (1980).

67, 624 P2d 188 (1981). A waiver is a voluntary relinquishment of a known right, *Sandblast v. Williams,* 254 Or 395, 460 P2d 1014 (1969), accomplished by a manifestation of willingness by a party that his duty to perform shall no longer be dependent on the occurrence of the condition. *Restatement of Contracts,* § 297, 439-41 (1932). However, "[s]uch a waiver * * * can be retracted at any time before the other party has materially changed his position in reliance thereon * * *." *Id.* at 440.

Plaintiff advances three arguments regarding waiver. First it claims that, at the time they entered into the agreement, defendants knew of the encumbrances and, having failed to object, are now estopped to insist on a clear title. Knowledge and failure to object at the time of contracting does not constitute a waiver. In an analogous situation, the Supreme Court held:

"* * * If the written contract provides that the vendor shall convey the premises free from encumbrances, it is immaterial that the purchaser had knowledge, at the time of contracting, that there was an encumbrance on the property. The vendor assumed the risk of acquiring clear title and the purchaser has the right to insist on the terms of the contract, *Crahane et al v. Swan,* 212 Or 143, 154-155, 318 P2d 942 (1957)." *Wittick v. Miles,* 274 Or 1, 6, 545 P2d 121 (1976).

The same reasoning applies here. Under the provisions of the contract quoted above, Kraljev agreed to submit a title policy, and, because she listed no exceptions in the agreement, it had to be one showing her title to be free of all liens and encumbrances. Although defendants may have intended from the outset to waive certain defects, they were entitled to approve Kraljev's title and to insist that she satisfy the terms of the contract and remove encumbrances to their satisfaction including obtaining consent from Sherwood & Roberts.

Plaintiff next contends that Arlo Gassner waived the encumbrances by sending a letter dated February 23, 1978, to Cameron Sinclair acknowledging that all "contingencies" had been satisfied and that they (defendants) intended to close the transaction. The letter, however, is somewhat ambiguous. The only "contingency" to which it refers is a physical inspection of the apartments. The

exchange agreement lists seven typewritten "terms and conditions," among them the right to inspect the properties. The duties relating to title insurance are printed terms, and there is nothing identifying them as either "contingencies" or "terms and conditions." Moreover, the letter was written prior to either party submitting a land sale contract and prior to Canaday's review of the transaction. The evidence does not demonstrate that, by sending the letter, defendants intended to waive approval of Kraljev's title, and there is no evidence that plaintiff, or anyone, relied on it as such. It is unclear from the record precisely what Sinclair communicated to the other parties with respect to the letter. Defendants' subsequent rejection of the land sale contract submitted by Kraljev and Kraljev's acceptance of the contract prepared on defendants' behalf by Canaday suggest that the letter was not taken by anyone to be a waiver.

Finally, plaintiff asserts that defendants waived the condition by allowing Sinclair to schedule a closing appointment for them. At that point in time defendants had fully reviewed the transaction, had submitted a draft of their own land sale contract and had been advised by Canaday regarding the desirability of obtaining Sherwood & Roberts' consent. Plaintiff contends that defendants demonstrated a willingness to forego the consent by scheduling closing and that their willingness is substantiated by the fact that they failed to communicate their objections to anyone other than Canaday and Sinclair. The record, however, reveals a far more complicated and confused state of affairs. Further explication is required.

The consent issue first became an impediment to consummation of the transaction following Arlo Gassner's conference with his attorney, Canaday, on March 21. Canaday advised that consent be obtained, and Gassner went along with that advice. Both Sinclair and Canaday discussed the matter with Jeanne Harris at the escrow company. Harris advised them that Pollock and Grayson, Kraljev's vendors, would consent but that she (Harris) was not to contact Sherwood & Roberts. Contrary to plaintiff's assertions, there is evidence that plaintiff was contacted regarding the same issue. During redirect examination of Cameron Sinclair, a portion of his deposition was read into

the record. The record reflects that Sinclair did talk to either Matt or Gregg Kraljev about obtaining Sherwood & Roberts' consent. Their response was that Grayson would withdraw his approval of the transaction if there was an attempt to contact Sherwood & Roberts. Sinclair stated there was a threat that the transaction could not close if satisfaction of Canaday's apprehensions was pursued. Sinclair was asked:

> "From that time forward, you understood that the transaction could not close with the consent that we have been referring to? Answer: Yes. It was a catch 22, if you will. If I tried to satisfy one requirement for approval, then the other approval would be withdrawn."

Sinclair further testified that the pace was hectic at that point and that he was receiving pressure from Matt Kraljev to close the transaction. Sinclair understood Kraljev's (and plaintiff's) position to be that the transaction was substantially ready to close and that it should be closed or should die at that point.

Sinclair and Arlo Gassner had several phone conversations and meetings during which Sinclair conveyed to Gassner the pressure he was receiving from plaintiff. Sinclair advised Gassner from a business point of view whether he should insist on having Sherwood & Roberts' consent and apparently recommended it was unnecessary. Gassner apparently indicated in some manner that he would go along. As previously noted, the record is not clear what this indication was. Sinclair testified that Gassner never expressly told him that he (Gassner) would or wanted to close the transaction without the consent of Sherwood & Roberts, but Sinclair understood, perhaps mistakenly, that to be defendants' position.

On March 27, 1978, Harris scheduled closing appointments with all parties for the following morning. Sinclair scheduled defendants' appointment for them. That afternoon Arlo Gassner called Canaday and asked him if he had straightened out the problem with the mortgage. Canaday replied that he had not and advised Gassner not to close without the consent. Gassner stated he would take the advice. Thereafter, Canaday called Sinclair, and Sinclair expressed his belief that the transaction would die if the consent were required.

Gassners failed to show up for their appointment on March 28. The only excuse offered by Sinclair was that Mrs. Gassner did not feel comfortable with the transaction. Sinclair scheduled another appointment for the 29th, but defendants did not appear.

By scheduling a closing appointment defendants gave the impression that they would proceed with the transaction without the consent of Sherwood & Roberts. That can be construed as a waiver, but their waiver was not irrevocable. Defendants communicated their dissatisfaction with the sale when they refused to close. Gregg Kraljev, on behalf of Sylvia Kraljev and plaintiff, requested written verification from Sinclair of the events. On March 31, Sinclair sent a letter to plaintiff which stated in part:

"On Tuesday, March 28th, Mr. Gassner informed me that Mrs. Gassner would not consumate the trade transaction by signing the closing papers * * *. Mr. Gassner said she felt the risk was too great. As you know, Mr. Richard Canaday acted as Mr. Gassner's attorney. He advised that, without consent for this transaction from Sherwood and Roberts, the underlying mortgagee, their investment would be subject to the provisions of the underlying mortgage's escalation clause."

In a subsequent conversation Sinclair informed Gregg Kraljev that the statements referring to Canaday's advice were placed in the letter specifically at the request of Mr. Gassner. The letter adequately apprised the other parties that defendants wanted the consent of Sherwood & Roberts and was sufficient to correct any impression they may have given that they would close without it.

Plaintiff points out that Sinclair's letter did not request that consent be obtained and argues that "buyer's remorse," not the failure to obtain the consent, was the true reason the transaction did not close. It was Kraljev's obligation, however, to furnish a title report showing clear title. See Brady et ux v. Ray et al, supra. In any event, there is evidence that Sherwood & Roberts' consent was not forthcoming and that the transaction would die if it were required. There is also evidence that defendants, with reason, wished to have the consent.

Finally, plaintiff argues that Sherwood and Roberts' consent was unnecessary, because a contract sale

will not trigger a due-on-sale clause and allow an underlying mortgagee to accelerate unpaid principal. Although decisions of other courts may support that position, plaintiff also acknowledges that the enforceability of due-on-sale clauses has not been decided by Oregon appellate courts. Defendants insisted on receiving the consent on the advice of legal counsel. Counsel advised that, without consent, a possibility of immediate foreclosure existed. Defendants' insistence on receiving consent to foreclose that possibility was justified.

We conclude that the transaction was not specifically enforceable between the primary parties and hold that under *Setser v. Commonwealth, supra,* plaintiff is not entitled to recover the commission.

Affirmed.