**IKON OFFICE SOLUTIONS, INC., an Ohio corporation, Plaintiff,**

**v.**

**AMERICAN OFFICE PRODUCTS, INC., dba Associated Business Systems, Inc., an Oregon corporation; Larry Bradley, an Oregon citizen; Lesa Bergey, an Oregon citizen; and Craig Knouf, an Oregon citizen, Defendants.**

**No. 00–64–JE.**

United States District Court,
D. Oregon.

April 26, 2001.

---

**1158**

Mark E. Friedman, Kenneth L. Schubert, III, Michael R. O'Connor, Garvey, Schubert & Barer, Portland, OR, for Plaintiff.

Jeffrey M. Edelson, Matthew A. Levin, Markowitz, Herbold, Glade & Mehlhaf, P.C., Portland, OR, for Defendants.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff Ikon Office Solutions, Inc. (Ikon) brings this action against defendants American Office Products, Inc. dba Associated Business Systems, Inc. (ABS), and three former employees of Ikon who now work for ABS: Larry Bradley, Lesa Bergey, and Craig Knouf. Plaintiff Ikon alleges that defendants Bradley and Bergey breached non-competition and confidentiality agreements with Ikon, that all defendants breached one or more fiduciary duties to Ikon, misappropriated Ikon's trade secrets, converted Ikon's documents and databases, and tortiously interfered with Ikon's contracts and economic relations. Ikon has moved for partial summary judgment, and defendants have filed a cross-motion for summary judgment against Ikon on all claims. For the reasons that follow, I deny plaintiff's motion, and grant defendants' cross-motion for summary judgment on all claims.

## BACKGROUND

Plaintiff Ikon[1] sells, leases, and services office machines, such as copiers, in a number of states including Oregon. Defendant ABS presently competes with Ikon in parts of Oregon. The President of ABS, defendant Knouf, is a former IKON employee.[2]

Ikon had hired Knouf away from a competitor in 1985. In December 1989, Knouf—then sales manager of Ikon's Eugene branch—hired defendants Bradley and Bergey away from their respective employers to work for Ikon. Bergey's for-

---

1. IKON is the successor of Automated Office Systems, Inc., and ALCO Standard Corp. For simplicity, I will collectively refer to them as IKON.

2. Prior to the instant litigation, Ikon had asserted various claims against ABS, Knouf, and others. That action was dismissed in accordance with a confidential settlement agreement.

mer employer, Savin Corp. (Savin), sued Ikon and Bergey for violating a non-competition agreement, which action was later settled.

By 1999, Bradley was a very highly regarded sales representative in Ikon's Eugene branch, and Bergey was the sales manager for the Eugene branch. Bradley resigned from Ikon on July 29, 1999, and Bergey left on September 7, 1999. After a brief interval, each was hired by ABS, though both deny any pre-arranged agreement to come to work for ABS. Ikon contends that, after joining ABS, Bradley and Bergey induced many of Ikon's best customers and employees to defect to ABS. Ikon asserts that Bradley and Bergey accomplished that result by improperly using the relationships they cultivated with customers while employed at Ikon, in violation of non-competition agreements, and by using stolen trade secrets in violation of confidentiality agreements. Ikon also alleges that Bergey, while still employed at Ikon, failed to take appropriate steps to prevent the loss of these customer accounts to ABS. Ikon seeks over twenty million dollars in compensatory and punitive damages from defendants, plus injunctive relief and attorney fees.

## STANDARDS

The court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed R Civ P 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). The court should resolve reasonable doubts about the existence of a material factual issue against the moving party. *Id.* at 631. The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *Id.* at 630–31.

## DISCUSSION

### A. *Validity of Bergey and Bradley's Non–Competition Agreements*

■ For purposes of defendants' motion for summary judgment, I must assume that Bergey and Bradley did sign the non-competition agreements as Ikon alleges, and that those documents were signed on the dates that appear on the face of the respective agreements.[3] For purposes of this motion, defendants further assume that the scope and duration of the non-competition agreements are reasonable. The dispositive question is whether the non-competition agreements comply with ORS 653.295(1), which provides that:

A noncompetition agreement entered into between an employer and employee is void and shall not be enforced by any

---

**3.** Ikon has not produced the original agreements nor fully explained their absence. Documents alleged to be photocopies of those agreements were later fortuitously discovered. Defendants also point to the absence of any

witness who remembers Bradley executing a non-competition agreement. However, for purposes of defendants' motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party.

court in this state unless the agreement is entered into upon the:

(a) Initial employment of the employee with the employer; or

(b) Subsequent bona fide advancement of the employee with the employer.

▌ Defendant Bergey argues that her non-competition agreement is void because she began working for IKON on December 1, 1989, but did not sign a noncompetition agreement until December 18, 1989. I agree. The term "initial employment" in ORS 653.295 "means when the employee starts work." *Olsten Corp. v. Sommers*, 534 F.Supp. 395, 398 (D.Or. 1982). *Cf. Perthou v. Stewart*, 243 F.Supp. 655, 659 (D.Or.1965) (agreement void where employment commenced on June 1 but the non-competition agreement was not signed until June 7);[4] *Pacific Veterinary Hospital, PC v. White*, 72 Or.App. 533, 696 P.2d 570 (1985) (agreement signed after employment commenced was void).

▌▌ The parties have cited no published Oregon case enforcing a non-competition agreement signed more than three

days after the employee commenced work or was promoted. *See Bouska v. Wright*, 49 Or.App. 763, 621 P.2d 69 (1980). If 17 days after is timely, as Ikon contends, then why not 20 or 30 or even 60 days? I decline Ikon's invitation to embark on that path, particularly when the Oregon Legislature has declared that a noncompetition agreement is void unless it complies with the statutory requirements. Under Oregon law, the right not to be subjected to a non-competition agreement, except as authorized by ORS 653.295, is an "important employment-related statutory right." *Dymock v. Norwest Safety Protective Equip. for Oregon Industry, Inc.*, 172 Or.App. 399, 405–06, 19 P.3d 934 (2001).[5]

Ikon attempts to create a material factual dispute by speculating that Bergey may not have commenced working for Ikon until December 18, but Ikon offers no evidence to support that theory, and Ikon's designated corporate representative, Ronald McGee, recently conceded at deposition that Ikon has no such evidence.[6] I hold that Bergey's non-competition agreement is void as a matter of law.

---

**4.** *Perthou* was decided before ORS 653.295 was enacted, but that statute essentially codified the extant case law.

**5.** In general, non-competition agreements tend to be disfavored, and—although no longer entirely prohibited—they are subject to legislative or judicial scrutiny. *See, e.g., Scott v. Snelling & Snelling, Inc.*, 732 F.Supp. 1034 (N.D.Cal.1990) (California has a strong public policy against enforcement of most non-competition agreements); *Burk v. Heritage Food Service Equip.*, 737 N.E.2d 803, 811 (Ind.App. 2000) (noncompetition agreements are strictly construed against the employer and enforced only if reasonable); *Turner Prof. Services, Ltd. v. Broussard*, 762 So.2d 184 (La.App.2000) (noting strong public policy in that state against noncompetition contracts); *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn 1998) (non-competition agreements "are looked upon with disfavor, cautiously considered, and carefully scrutinized").

**6.** Bergey testified at deposition that she began working for Ikon on December 1, 1989. She testified similarly in the *Savin* trial a decade earlier. Knouf, who hired her for Ikon in 1989, recalls that Bergey began work a week before the office Christmas party, held on December 8 that year. Her paycheck shows she began work on December 1, as do other documents in her personnel file. By comparison, defendant Bradley began work on December 11, 1989, and his paycheck accurately reflects the date that he began work. Ikon speculates that perhaps Bergey might have received a signing bonus which placed her on the payroll beginning December 1, but did not actually commence work until December 18. However, Ikon offers no evidence that this actually occurred, and Knouf, who hired Bergey for Ikon, denies there was any such bonus. The record also shows that Bergey sold over $60,000 in goods and services for Ikon in December 1989, an improbable feat if she didn't start work until a few days before

■ I reach the opposite conclusion with regard to Bradley. His non-competition agreement is dated December 4, 1989, and he did not begin working for Ikon until December 11, 1989. Defendants have suggested that the document might have been backdated, but offer no evidence that occurred. While there is a considerable range of dates on various documents signed by Bradley (from December 4 through December 18), that does not establish that the non-competition agreement was backdated. Defendants also have suggested that the document proffered by Ikon may have been forged, and have questioned Ikon's failure to produce the original and also the circumstances under which the copy was discovered. It is not necessary to decide whether that evidence is sufficient to create an issue for trial because I conclude, for different reasons, that Ikon is barred from enforcing the agreement against Bradley.

## B. *Whether Ikon can Enforce these Non–Competition Agreements*

■ Defendants argue that Ikon is estopped from enforcing the non-competition agreements against Bergey and Bradley, or has waived those rights. I agree.

Less than a year before he decided to leave Ikon, Bradley requested and was given a copy of his personnel file.[7] It did not contain a non-competition agreement. When Bradley resigned on July 29, 1999, he specifically asked his supervisor, Bergey—who was then sales manager of Ikon's Eugene branch—whether he was subject to a non-competition agreement. Bergey telephoned Gina Salt at Ikon's Tigard office, who was responsible for maintaining the personnel files of all sales representatives in Oregon, including Bradley. It is undisputed that, if Bradley had a non-competition agreement with Ikon, it should have been in Bradley's personnel file. With Bradley listening on the speaker phone, Bergey told Salt that Bradley was resigning, and asked whether there was a non-competition agreement with respect to Bradley.[8] Salt says she checked Bradley's personnel file, determined that "there wasn't a non-competition in the file," and told Bergey[9] that "we have no non-compe-

Christmas as Ikon contends. Finally, Knouf has stated that Bergey and Bradley were his first two hires as branch manager, that he was unaware that they needed to complete certain documents upon commencing employment, that he was later reprimanded for his oversight, and that another Ikon employee, David Yordy, subsequently obtained some paperwork from Bergey and Bradley. Yordy's signature appears on several other documents that Bergey signed on December 18, 1989.

Ikon also argues that it was company policy to require non-competition agreements for all employees. However, Knouf has stated that he was not aware of this policy when he hired Bergey in 1989, hence he did not condition her employment with Ikon upon signing such an agreement. Ikon has not refuted that testimony. Ikon also argues that it is unusual to begin work on a Friday, but that was the first

day of the month, a traditional beginning date for commercial transactions. Ikon has failed to produce sufficient probative evidence from which a reasonable jury could conclude that Bergey began work on December 18 rather than on December 1.

7. The original personnel files were kept in a secure location in Ikon's Tigard office.

8. Salt had previously received calls of this nature. If the departing employee was a sales person, she typically would be asked "if there was a noncompete."

9. Salt was not absolutely certain whether this conversation was with Bergey, or with Ernie White, Ikon's Oregon marketplace president, or if she had spoken to each separately. Bradley recalls asking both White and Bergey whether he was subject to any non-competi-

tition on file." [10]   Neither Salt nor anyone else at Ikon suggested to Bradley that there might be a non-competition agreement in some other location, or that Ikon considered Bradley to be bound by a non-competition agreement even though Ikon could not presently locate that contract. Ikon also did not advise Bradley of the scope and duration of any restrictions to which he allegedly was subject.   Ikon's designated corporate representative, Ronald McGee, testified at deposition that—if an employee has a non-competition agreement—Ikon's policy is to review the terms of that agreement with the employee during an exit interview.   No such discussion occurred when Bradley resigned.

The day after Bradley left Ikon, he met with Knouf to discuss possible employment with ABS.   Knouf states that his company's policy is to honor any valid non-competition agreements, and he rejects applicants whose employment would violate an enforceable non-competition agreement.   ABS retains an attorney to assist in evaluating such applications.   Although Bradley told Knouf he had checked with Ikon's human resources department and confirmed that he was not subject to a non-competition agreement, Knouf says he was concerned that Ikon was looking for an excuse to sue ABS, and knew that Ikon would not look favorably on his hiring one of Ikon's top sales persons.   In addition, it would cost ABS hundreds of thousands of dollars to open a Eugene branch office. Knouf was willing to make that expenditure only if Bradley was available to oversee that new office.   Knouf therefore telephoned Ikon's Eugene sales manager,

Bergey, who confirmed that Bradley was not subject to a non-competition agreement.

On or about August 2, 1999, Ikon's senior counsel, Andrew Topping, sent Bradley a letter reminding him of his obligation to preserve certain confidences, but the letter did not mention a non-competition agreement.   On August 9, 1999, ABS formally extended a job offer to Bradley, who accepted.   On August 11, 1999, counsel for ABS, Jeff Edelson, sent a letter to Topping advising him that Bradley was now employed by ABS and asserting that, in the absence of a valid non-competition agreement, an employee may properly compete with a former employer.   Edelson's letter all but invites Ikon to assert a non-competition agreement, if one exists, but Ikon never responded.

After hiring Bradley, ABS signed a five-year lease on an office in Eugene, purchased a truck and equipment for the new Eugene branch, commenced an advertising campaign featuring Bradley, hired administrative staff for that office, and made other commitments (financial and otherwise) in reliance on Bradley being immediately available to work for ABS in Eugene. ABS estimates it expended nearly $700,000 to create a Eugene branch in the weeks immediately after hiring Bradley.

On September 7, 1999, Bergey resigned from Ikon. Before leaving, she asked Gina Salt whether she was subject to a non-compete agreement, and Salt responded that there was no such agreement on file. Ernie White (Ikon's Oregon marketplace president) and perhaps also Beverly

---

tion agreement, and he recalls White ordering Bergey to contact Gina Salt to obtain a copy of any applicable non-competition agreement. These minor discrepancies in memories do not affect my analysis of this claim.

**10.**   Bradley's recollection is that Salt said "there is no noncompete—Larry does not have a noncompete agreement."   However, for purposes of defendants' motion, I must view the evidence in the light most favorable to Ikon, so I will rely upon Salt's account of the conversation.

Edmondson (Salt's supervisor, and a human resources manager in Oregon) asked Salt the same question, and received the same answer. Bergey was not advised about a non-competition agreement in an exit interview—as is Ikon's practice when an employee is subject to a non-competition—nor did Bergey receive any correspondence or other communications from Ikon regarding that topic after she resigned. On or about September 30, 1999, Bergey was hired by ABS.[11]

In October 1999, an Ikon employee discovered two folders while cleaning out a filing cabinet in a vacated office in the Eugene branch. Inside the folders were what appear to be copies of non-competition agreements for Bradley and Bergey. Deposition testimony disclosed that the office had been occupied by a succession of Ikon administrative employees, each of whom denied knowledge of the contents of the filing cabinet. The files most likely had been created by David Yordy when he occupied that office in 1989, and had been undisturbed ever since.

By now, Ikon was starting to lose big accounts to Bradley and ABS, so the discovery of these documents provoked great excitement within Ikon. On or about October 14, 1999, Ikon's senior counsel, Andrew Topping, sent a letter to Bradley asserting that he was in violation of the non-competition agreement, and demanding that Bradley comply within three days. Jeff Edelson, counsel for ABS responded that this was a "textbook example" of waiver and estoppel, and that Bradley and ABS had detrimentally relied upon Ikon's assurances that there was no non-competition agreement. Edelson's letter also

questioned whether the document was genuine, and told Topping, "We will want to examine the original [document] if you intend to continue to press this issue." Ikon did not respond to Edelson's letter.[12] Ikon then waited almost three months before filing this action.

Given these undisputed facts, I have little difficulty concluding that Ikon is estopped to enforce the noncompetition agreements against Bradley and Bergey, and/or has waived its rights under those agreements. The non-competition agreements were for Ikon's benefit. It was incumbent upon Ikon to timely assert its rights, especially given the brief duration (one year) of those agreements. Instead, Ikon told Knouf and Bradley that the latter was not subject to a non-competition agreement, and told Bergey that she was not subject to a non-competition agreement. In reliance upon those representations, ABS hired Bradley and Bergey, expended over half a million dollars to open a Eugene branch, and is now facing a lawsuit by Ikon seeking millions of dollars in damages.

Ikon did not attempt to correct its misrepresentations until after defendants had materially changed their position, to their detriment, in reliance upon Ikon's representations. Even then, Ikon's efforts were half-hearted as to Bradley and non-existent as to Bergey. Even after Ikon located a copy of Bergey's non-competition agreement, Ikon never contacted Bergey or ABS to correct Ikon's prior statement that Bergey was not covered by a non-competition agreement, or to advise Ber-

---

**11.** Knouf says that, before hiring Bergey, he confirmed with Ernie White that Bergey was not subject to a non-competition agreement. White denies that conversation. For purposes of defendants' summary judgment motion, I must accept White's version.

**12.** Although this litigation commenced in January 2000, Ikon waited until late August of that year before belatedly disclosing that it was unable to locate the original documents.

gey and ABS of the terms of that agreement.

Having induced defendants to believe that Bradley and Bergey were not bound by non-competition agreements, Ikon cannot now deny its own representations in order to recover damages for a largely self-inflicted wound.

■ The doctrine of equitable estoppel is employed to prevent a person from proving an important fact to be something other than what by act or omission he has led another party justifiably to believe. *Wiggins v. Barrett & Associates, Inc.*, 295 Or. 679, 689, 669 P.2d 1132 (1983). The undisputed facts establish that defendants detrimentally and reasonably relied upon Ikon's representations. The noncompetition agreement covered only the Eugene sales territory, with a one-year duration. Knouf has stated, and Ikon has not controverted, that Bradley is such a super salesman that Knouf would have deferred opening a Eugene branch and instead assigned Bradley to a territory in Salem or Portland until the noncompetition agreement expired. However, after Ikon repeatedly represented that there was no such agreement, ABS incurred the considerable expense (and potential liability) to open a Eugene branch office for Bradley. *Cf. Simons v. City of Portland*, 132 Or.App. 74, 84, 887 P.2d 824 (1994) (exposure to liability can be a sufficient "detriment" for purposes of equitable estoppel). Bradley and ABS also placed their reputations on the line by promising to service customers in Eugene.

■ Ikon argues that, to prove an estoppel, defendants must show that Ikon *deliberately* made representations it knew to be false, with the *intent* that ABS act upon those representations, *i.e.*, by hiring Bradley and Bergey and competing with Ikon in the Eugene market. Ikon's definition of estoppel would require defendants

to prove all the elements of common law fraud. "Although the elements set out [in some published decisions] would seem to require proof of actual intent, and perhaps even a fraudulent representation, the cases do not require so much." *Hess v. Seeger*, 55 Or.App. 746, 761, 641 P.2d 23 (1982). "It is not necessary to the existence of an equitable estoppel that there should exist a design to deceive or defraud, but it is sufficient if the person against whom estoppel is asserted by his silence or representation has created a belief of the existence of a state of facts which it would be unconscionable to deny." *Id.* at 762, 641 P.2d 23, quoting *Schmeck v. Bogatay*, 259 Or. 188, 197, 485 P.2d 1095 (1971) (acknowledging that estoppel by conduct may not require proof of intent to mislead). *See also Belleville v. Davis*, 262 Or. 387, 397, n. 6, 498 P.2d 744 (misrepresentation may be negligent or even entirely innocent), quoting Prosser, *Torts* § 105 (4th ed). The doctrine of equitable estoppel prevents a person "from taking an inequitable advantage of a predicament in which his own conduct has placed his adversary." Prosser & Keeton *on Torts*, § 105 (5th ed). "To constitute an equitable estoppel ... there must have been some omission, misconduct, misrepresentation, or fraud by the party against whom the estoppel is asserted ... which caused another to be misled, and, because of being misled, to have been induced to have altered his position [in some material respect.]" *Security Savings & Trust Co. v. Portland Flour Mills Co.*, 124 Or. 276, 292, 261 P. 432 (1927).

Ikon clearly understood the significance of the representations it made to Bergey, Bradley, and Knouf, and the reasons why these questions were being posed. Ikon knew that ABS was aggressively recruiting Ikon employees, and surely anticipated that Bradley, Bergey, and ABS might act,

as they did, in reliance upon Ikon's representations that Bradley and Bergey did not have non-competition agreements. In the context of an equitable estoppel, whether Ikon wanted ABS to hire Bradley and Bergey, or fervently desired the opposite result, is not controlling. Having induced defendants to reasonably believe that Bradley and Bergey could work for ABS in Eugene without fear of violating a non-competition agreement, Ikon is now estopped to assert that the employment of Bradley and Bergey is a violation of such an agreement.

■ Ikon also argues that, as a matter of law, there can be no estoppel because Bergey and Bradley both had knowledge of the non-competition agreements, having signed them ten years earlier. However, it would be an unusual employee who could remember the exact contents of every document pressed in front of them around the time they were hired ten years before. Even assuming that Bradley and Bergey recalled signing some type of non-competition agreement—which they deny—it is unlikely that they would recall the precise terms. Upon departing Ikon, Bergey and Bradley sought to clarify their obligations to Ikon by specifically asking whether they were subject to a non-competition agreement. Ikon responded that they were not. ABS made similar inquiries, with similar results. It is difficult to see how these defendants could have complied with an agreement whose existence was denied by Ikon and the terms of which were unknown to them. As between the parties, Ikon was in the best position to prevent this misunderstanding.

■ Ikon's argument also proves too much, because Ikon itself is charged with knowledge of the non-competition agreements. Thus, if there was not an equitable estoppel (because defendants had knowledge of the true facts), then Ikon intentionally relinquished a known right when it told Bradley, Bergey, and ABS that there was no non-competition agreement. Ikon argues that it did not intend to waive its rights, but what matters is the objective manifestations evidenced by Ikon's words and deeds, not some hidden subjective reservations or intent. Ikon gave Bradley and Bergey the green light to compete, and gave ABS the green light to hire them. There was nothing "equivocal" about Ikon's conduct, at least not until after defendants had detrimentally relied upon Ikon's representations such that the waiver had become irrevocable. *See Wallstreet Properties, Inc. v. Gassner,* 53 Or.App. 650, 632 P.2d 1310 (1981) (waiver was revocable up until the other party had materially changed his position in reliance thereupon).

■ Ikon also argues that Gina Salt did not actually tell Bergey and Bradley that there was no non-competition agreement, but merely that there was no agreement in those particular file folders. Ikon additionally argues that Bradley and Bergey never asked Salt whether there was a non-competition agreement in some other location. Ikon is splitting hairs. By all accounts, if Bradley or Bergey had signed a non-competition agreement, it should have been in the personnel files kept by Gina Salt. Ikon itself was unaware, until months later, that additional documents had been gathering dust for the past ten years in a file cabinet in a different office. Ikon cannot fault Bergey and Bradley for not asking Ikon to look in that particular filing cabinet, when there is no evidence that Bradley or Bergey (or anyone else at Ikon, for that matter) knew the contents of that filing cabinet. A reasonable person would have interpreted Salt's response to mean that Ikon was not claiming that Bradley and Bergey were bound by a non-competition agreement. That is also the

message that Bergey conveyed to ABS when Knouf inquired about hiring Bradley. Ikon's own counsel apparently reached the same conclusion, because he did not assert that Bradley or Bergey were bound by a non-competition agreement until after the copies fortuitously surfaced months later.

There is no dispute concerning the material facts of this claim, but only the legal significance of those facts. I conclude that Ikon is estopped from enforcing the non-competition agreements against Bergey and Bradley, and/or has waived those rights.

### C. *Conversion*

Ikon alleges that defendant Bergey, in her capacity as Eugene branch sales manager, committed a conversion by giving an Ikon employee, David Maeda, the original of his non-competition agreement with Ikon. Bradley, Knouf, and ABS are accused of conspiring with Bergey to commit this deed with the aim of facilitating Maeda's defection to ABS. However, Ikon now concedes that Bergey was merely following orders from Ikon's Oregon marketplace president, Ernie White, who told Bergey to give that document to Maeda.[13] Accordingly, this claim is meritless.

■ Ikon also alleges that defendant Bergey converted printouts from an Ikon marketing database, again as part of a conspiracy to help Bradley, Knouf, and ABS. However, Ikon has produced no evidence that defendants have these printouts (or any other Ikon documents), nor has Ikon produced sufficient evidence for a jury to conclude that any documents are missing or that Bergey took them. Deposition testimony from Ikon's own witnesses

also makes clear that Bradley already had this information in his head, having provided much of the data in the first place, and ABS had little need for such documents.

Ultimately, Ikon's conversion claim boils down to little more than a suspicion, which is not enough to survive summary judgment. I therefore do not address defendants' alternative argument that Bergey's conduct, even as alleged by Ikon, would not constitute a "conversion."

### D. *Breach of Fiduciary Duty*

■ This claim essentially alleges that, after Bradley departed, Bergey stayed behind at Ikon as an ABS mole, stealing trade secrets, converting documents, and undermining Ikon's efforts to compete with ABS. Portions of this claim are intertwined with the conversion and trade secrets claims, and the disposition of those claims applies here as well. As for the remaining allegations, Ikon has produced no evidence that Bergey was an ABS mole who intentionally failed to perform her duties as part of a conspiracy to aid ABS. Acknowledging that failure, Ikon now urges the court to adopt a strict liability theory. As Ikon sees it, Bergey was the Eugene branch sales manager. Ikon ordered her to "shore up" Ikon's key accounts to prevent ABS from winning those customers, Bergey squandered this opportunity, and failed to implement that directive.

Ikon concedes that it never told Bergey just how she was supposed to accomplish that objective. Ikon also has not produced evidence that Bergey would likely have succeeded in that endeavor, or that Bergey had the time and resources to accomplish that task.[14] These defects are fatal to

---

**13.** Maeda had signed the agreement earlier that day, but had second thoughts and requested an opportunity to reconsider.

**14.** It is also curious that Ikon admits it tried to persuade Bergey to remain with the company, yet now claims her job performance around that same time period was so abysmal

Ikon's claim, but it suffers from a more basic flaw as well. Even assuming that Bergey could have done more to shore up those accounts, but squandered that opportunity, this court is unaware of any case in which a midlevel employee such as Bergey was held liable for such an omission.

The annals of American business are littered with missed opportunities: businesses that failed to recognize or exploit advantages, or to protect their market share against inroads by competitors.[15] Employees can expect to be fired for such mistakes, and CEO's forced to leave, but it is not expected that the employee must then pay, from his or her own pocket, the profits that the company allegedly would have earned. Defendants are entitled to summary judgment on this claim.

### E. *Misappropriation of Trade Secrets*

Ikon next contends that defendants stole Ikon's trade secrets. Ikon has not produced evidence from which a reasonable jury could find that defendants misappropriated any documents or otherwise wrongly acquired any trade secrets.[16] Accordingly, all that remains of this claim is Ikon's contention that, in their new jobs with ABS, Bradley and Bergey used information that they learned while employed by Ikon.

■ Ikon, as the plaintiff, has the burden of proving both the existence of a trade secret and its misappropriation. *Western Medical Consultants, Inc. v.*

*Johnson,* 835 F.Supp. 554, 557 (D.Or.1993), *aff'd,* 80 F.3d 1331 (9th Cir.1996). For purposes of the Oregon Trade Secrets Act:

(4) "Trade secret" means information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

ORS 646.461. " 'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." ORC 646.461(1).

■ Ikon first contends that Bradley's knowledge of the identity of Ikon's customers is a trade secret. A customer list can sometimes be a trade secret, *e.g.,* when the employer has expended considerable time and money to pinpoint a narrow segment of the population that is interested in this product or service. *See, e.g., Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514, 66 Cal. Rptr.2d 731, 735–36 (1997) ("great effort" and expense to identify customer base).

---

that she should be required to pay the company damages.

**15.** Generals, too, have often been accused of squandering opportunity. *See, e.g.,* Phillip Paludan, *The Presidency of Abraham Lincoln,* chapters 5 and 7 (Univ. Press of Kansas, 1994) (recounting President Lincoln's exasperation at General George McClellan's repeated failure to attack the Confederate army). McClellan ultimately was relieved of

duty, but he was not charged with treason. *Id.*

**16.** Although unexplained success may sometimes give rise to an inference that a person has relied upon purloined materials, Ikon has conceded that Bradley and Bergey could have achieved the results they have on behalf of ABS "with what they've got in their head" and did not need to rely on stolen documents.

■ This is not such a case. Eugene, Oregon, is a comparatively small market. A person with a rudimentary knowledge of the industry, the Yellow Pages, and business data publicly available from sources such as the Chamber of Commerce can quickly identify the principal consumers of copying equipment in that region. *Cf. Western Medical Consultants*, 835 F.Supp. at 557–58 (customer information not trade secret if it is commonly known in the industry or readily ascertainable through public sources); *North Pacific Lumber Co. v. Moore*, 275 Or. 359, 371, 551 P.2d 431 (1976) (salesman not forbidden to use, in his new job, knowledge of customers gained during prior employment); *Vigoro Industries, Inc. v. Cleveland Chemical Co. of Arkansas*, 866 F.Supp. 1150, 1162–63 (E.D.Ark.1994) (customer list not a trade secret, since the identity of the few hundred farmers in the vicinity was generally known or readily ascertainable), *aff'd*, 82 F.3d 785, 790 (8th Cir.1996).[17]

If the identity of Ikon's major customers in the Eugene area were a protected trade secret, a former Ikon sales representative would find it difficult, if not impossible, to ever work for Ikon's competitors in that region. This amounts to a long-term non-competition requirement, but without any of the restrictions that the Oregon Legislature has imposed upon non-competition agreements. *See* ORS 653.295. *Cf. Carolina Chemical Equip. Co. v. Muckenfuss*, 322 S.C. 289, 471 S.E.2d 721, 723 (1996) (far-ranging covenant against disclosure of trade secrets was equivalent to a covenant not to compete with unlimited duration and scope); *Vigoro*, 82 F.3d at 790 ("The former employer should not be permitted to achieve this anticompetitive objective indirectly through an overly-expansive definition of customer trade secrets.")

■ Ikon next contends that the names of the contact persons at these companies is a trade secret. If thousands of names were involved (and thus considerable effort and expense was required to obtain this information), or the names were otherwise difficult to obtain, this argument might be better taken. However, it appears that only a few dozen names are at issue, and a competitor could obtain those names simply by calling the company and inquiring, "Who buys your copier equipment?" Indeed, that appears to be how Bradley obtained those names in the first place. In theory, Bradley could have gone through the fiction of calling each company to request the name anew, but that exercise would yield no tangible benefit for Ikon and it would be confusing for the customers because Bradley had been doing business with these individuals for years.

■ Ikon next argues that information regarding each account is a trade secret, such as what equipment the company has in each location, the volume of copies used, the customer's needs and preferences, and when leases expire. There is no evidence that Bradley took any confidential information from Ikon. Rather, this is information that Bradley had in his head from years of personally cultivating these accounts. Much of that data can readily be obtained from public sources, such as UCC filings, or by asking the prospective customer (*e.g.*, how many copiers do you pres-

---

17. *See also R & R Assoc. of Pinellas County, Inc. v. Armendinger*, 119 B.R. 302, 304 (Bkrtcy.M.D.Fla.1990) (when list of customers can easily be obtained from public sources, former employee is not precluded from contacting customers he met while working for his prior employer); *Robert S. Weiss & Assoc. v. Wiederlight*, 208 Conn. 525, 546 A.2d 216, 224–25 (1988) (insurance salesman not precluded from contacting accounts he cultivated during prior employment).

ently have, what model, are you happy with your present vendor, and when does your current lease expire?) [18] A knowledgeable sales representative can also make an educated guess as to the copy volume simply by knowing what machines the customer has. In theory, Bradley could easily obtain all this information anew by making a few inquiries, though his prospective customers surely would wonder why he was asking questions to which he already knows the answers.

A court cannot compel a man who changes employers to wipe clean the slate of his memory. *See North Pacific Lumber,* 275 Or. at 371, 551 P.2d 431 (lumber trader not precluded from using knowledge of customers gained during prior employment); *Vigoro,* 82 F.3d at 790 (salesman's knowledge of local customers gained from prior employment was not a trade secret); *Scott,* 732 F.Supp. at 1044–45 (departing employee is not forbidden to use knowledge of customers' preferences acquired through personal interaction with those individuals); *Fleming Sales Co. v. Bailey,* 611 F.Supp. 507, 514 (N.D.Ill.1985) (employee is not obliged to perform a prefrontal lobotomy on himself to erase all knowledge of customers' needs garnered during his employment); *Robert S. Weiss & Assoc. v. Wiederlight,* 208 Conn. 525, 546 A.2d 216, 224–25 (1988) (insurance salesman not precluded from soliciting accounts cultivated during his prior employment); *Carolina Chemical,* 471 S.E.2d at 725 (employee may use knowledge of industry he acquired during 17 years with prior employer).[19]

■ Finally, Ikon argues that defendants misappropriated Ikon's confidential pricing information and marketing strategies. There is no evidence that any documents were taken, only what is in defendants' minds. Although pricing information and marketing strategy can be

---

**18.** Ikon places considerable weight upon Bradley's deposition testimony that he treated all information in Ikon's database as "sensitive," and would not show it to a competitor. However, Bradley explained that this was not because the competitor could not readily obtain the same information, often just by asking, but because Bradley did not want to make his rival's job any easier. "I wouldn't show it to a competitor because … it would save him from having to exert the effort to go ask the customer questions himself."

**19.** In *Fleming,* 611 F.Supp. at 514, the court declined to grant trade secret protection for:

[K]nowledge of the individual persons at these customers to contact in order to effectuate sales; the prior purchasing history of the customers; the product and service requirements; their present and future projected needs; the packages that Fleming must put together in order to sell particular products; their payment histories; and their buying procedures.

In *Vigoro,* 866 F.Supp. at 1161, the former employer unsuccessfully argued that the following were trade secrets:

1. The fact that the farmer is a customer of the Vigoro Marvell Farmarket;
2. The farmer's history of crops planted, timing of planting, crop rotation schedule, and plans for future planting;
3. The history of Vigoro's product sales to the farmer, which reveals the farmer's preferences for various fertilizer and pesticide products;
4. The farmer's history of having a cotton crop scouted for insects by Vigoro salesmen, which reveals the farmer's willingness to receive and pay for this service and the potential for increasing pesticide services to the farmer;
5. The farmer's history of having soil samples analyzed at Vigoro's expense which, together with the history of fertilizer sales to the farmer, demonstrates the farmer's willingness to have this service performed and his or her willingness to purchase custom-blended fertilizer to treat specific acreage differently depending on their differing nutrient needs; and
6. The farmer's creditworthiness for farmsupply purchases, which determines the amount that can safely be sold to the farmer on credit.

a trade secret, *Optic Graphics, Inc. v. Agee,* 87 Md.App. 770, 591 A.2d 578, 586 (1991), Ikon has not directed the court's attention to any materials of this nature that truly warrant protection as a trade secret, as opposed to general business knowledge. *Cf. Western Medical Consultants,* 835 F.Supp. at 558.[20]

I also note that, if Bergey and Bradley did have knowledge of such trade secrets, then the practical result might be to permanently bar them from competing with Ikon anywhere in the world—not just in Eugene for a period of one year, as specified in the non-competition agreement. The court is wary of excluding a person from pursuing his or her livelihood (or subjecting a company to liability for hiring that person, which may amount to the same result) unless there is a fairly substantial showing that the item merits such protection. Ikon has not demonstrated that these so-called "secrets" warrant such protection.

■ Ikon's trade secrets claim also falters on the absence of evidence that defendants improperly used any "trade secrets" to compete with Ikon or that Ikon was injured as a result. Out of at least 43 customers that defected to ABS, Ikon chose to depose only two. Karen Romero testified that she switched to ABS because she had a good working relationship with Bradley and wanted to continue doing business with him. Of particular importance to her was "Larry's passion for excellence and the service that he provided that always either met or exceeded expectations." That is not a trade secret, but simply Bradley's reputation in the relevant business community.

Patricia Wodke testified that her company was dissatisfied with Ikon's service, machines kept breaking down, there were billing problems and each time she called to fix the problem she had to speak with a different person. Her company's CEO finally took matters into his own hands, contacted Bradley at ABS, and "asked him to come see [Wodke] and talk to her about our equipment." Wodke gave Bradley a list of the equipment her company already had, told him what the company's needs were and what problems they were having, and he submitted a proposal to replace the existing equipment and explained why the new equipment would be superior. This customer was so anxious to change vendors that it paid an early termination fee on the lease for its existing equipment. Again, there is no evidence that Bradley somehow misused Ikon trade secrets. Rather, Ikon apparently was not meeting this customer's needs, so the company found a vendor that would.

**F.  *Tortious Interference Claims***

To succeed on its tortious interference claims, Ikon must prove that the result was "accomplished through improper means or for an improper purpose." *Straube v. Larson,* 287 Or. 357, 360–61, 600 P.2d 371 (1979). As Ikon correctly conceded at oral argument, if I grant defendants' motion for summary judgment on the other claims, the tortious interference claims necessarily fail as well.

---

**20.** For instance, one such document was a revenue "quota" in which Ikon's field troops were told how much revenue they were expected to generate during the coming fiscal year. Such a document may have some inspirational value, like a coach exhorting his team "no fumbles today" just before the big game, but Ikon has not shown how such information would permit ABS to prevail over Ikon in the competition for a specific customer. Nor, for that matter, does this appear to be significantly greater information (or any more reliable) than what is already publicly available from securities analysts who follow the company (which is traded on the New York Stock Exchange) and on Ikon's web site.

## G. *Other Motions*

Defendants' Motion (# 24) to Hold Trial in Eugene is now moot. Defendants' Motion (# 73) to Strike "Evidence" filed by Plaintiff is primarily directed at assertions in Plaintiff's memorandum that are (allegedly) not supported by evidence in the record. This is really more in the nature of argument. The court has read the record and will decide for itself whether the assertions are supported. Defendants also assert that certain statements in Plaintiff's affidavits are not based on personal knowledge or are hearsay. Although some of those objections are well taken, the issue is moot in light of my ruling on the cross-motions for summary judgment.

## CONCLUSION

Defendants' Motion (# 53) for Summary Judgment on all claims is GRANTED. Plaintiff's Motion (# 50) for partial Summary Judgment is DENIED. Defendants' Motion (# 24) to Hold Trial in Eugene, and Motion (# 73) to Strike, are both DENIED as moot. Any remaining motions are DENIED as moot.